1 Christopher Hellmich (SBN 224169)
chellmich@hellmichlaw.com
2 **Hellmich Law Group, PC**
5733-G E. Santa Ana Canyon Rd., #512
3 Anaheim Hills, CA 92807
Tel: 949-287-5708
4
David J. Kaplan
5 dave.kaplan@axel.org
StoAmigo International, LLC
6 5538 S. Eastern Ave.
Las Vegas, NV 89119
7 Tel: 702-948-9770 ext. 2020
(*pro hac vice motion to be filed*)
8
9 Attorneys for Plaintiff
StoAmigo International, LLC
10
11
12
13                    **UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**
14
15 STOAMIGO INTERNATIONAL,        Case No.:  **2:19-cv-00224**_____
LLC, a Wyoming Limited Liability
16 Company
**COMPLAINT FOR:**
17         Plaintiff,
vs.                              1. **FRAUD IN THE**
18                                    **INDUCEMENT**
VANBEX GROUP INC., a Canada      2. **NEGLIGENT**
19 corporation; LISA CHENG, an        **MISREPRESENTATION**
individual; and KEVIN HOBBS, an  3. **BREACH OF CONTRACT**
20 individual;                      4. **BREACH OF THE**
                                     **COVENANT OF GOOD**
21         Defendants.                **FAITH AND FAIR DEALING**
22
23                                  **JURY TRIAL DEMANDED**
24
25
26
27
28

                              1
                          COMPLAINT

Plaintiff StoAmigo International, LLC complains of Defendants Vanbex Group, Inc., Lisa Cheng, and Kevin Hobbs as follows:

## THE PARTIES

1.     Plaintiff StoAmigo, International, LLC ("Plaintiff") is, and at all times relevant was, a Wyoming Limited Liability Company with its principal place of business located in Las Vegas, Nevada. Plaintiff's sole member is domiciled in the state of Wyoming.

2.     Upon information and belief, Defendant Vanbex Group Inc. ("Vanbex") is a corporation organized and existing under the laws of Canada, with its principal place of business at Suite 860, 625 Howe Street Vancouver, British Columbia, Canada V6C 2T6.

3.     Upon information and belief, Defendant Lisa Cheng ("Cheng") is, and at all times relevant hereto was, an individual residing in Canada whose place of business is located at Suite 860, 625 Howe Street Vancouver, British Columbia, Canada V6C 2T6.

4.     Upon information and belief, Defendant Kevin Hobbs ("Hobbs") is, and at all times relevant hereto was, an individual residing in Canada whose place of business is located at Suite 860, 625 Howe Street Vancouver, British Columbia, Canada V6C 2T6. Upon information and belief, Hobbs resides at 1207 West Hastings, Vancouver, British Columbia, Canada. Collectively, Vanbex, Cheng and Hobbs are the "Defendants".

5.     Plaintiff is informed and believes, and based upon such information and belief alleges, that at all times relevant hereto, each Defendant was the owner, agent, employee or employer of each of its co-defendants, and in doing the acts hereinafter mentioned, each Defendant was acting within the scope of its authority and with the permission and consent of its co-defendants, and each of them, and that said acts of each Defendant was ratified by said Defendant's co-defendants, and each of them.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because there is

complete diversity of citizenship and the amount in controversy is greater than $75,000.

7.     This Court has personal jurisdiction over Vanbex, Cheng, and Hobbs, and venue is proper in this district because a contract that gives rise to the instant complaint includes an agreement by both Plaintiff and Vanbex that any action related to the contract "will be instituted and prosecuted in a court of competent jurisdiction in California, United States of America and each party waives its right to a change of jurisdiction." As described herein, Cheng and Hobbs caused Vanbex to enter into the aforementioned contract and/or ratified the contract on behalf of Vanbex and committed the acts detailed herein, including making intentionally fraudulent and/or negligent misrepresentations that Plaintiff relied on in executing the contract with Vanbex.

## **GENERAL ALLEGATIONS**

8.     Plaintiff is a computer technology innovation company. Since 2012, it has built a suite of software products enjoyed by millions of users. Many of those products are innovative solutions aimed at giving users full control over their digital lives in a world that has been taking away such control more and more over time.

9.     One example of a product that the Plaintiff conceived of and built is called TackApp®, which, among other things, addressed the dilemma individuals often faced in having their data easily accessible without yielding control to a third party. Where individuals once had a single desk top computer, over time they continued to add more and more devices into their digital lives, including smart phones, tablets, and additional computers, and their files were typically dispersed across these devices. Previously, individuals could only access the files stored on these devices by being physically present at the devices themselves or by using a centralized storage system such as the cloud. However, the cloud has its own set of disadvantages as it would most likely be owned or operated by a third-party, and typically comes with a set of terms and conditions that a user must agree to prior to use, resulting in a loss of ownership and/or control of files for a user. Moreover, third party

cloud storage may be subject to increased security risks.

10.     TackApp allows users to unify their devices by linking the storage of every compatible device they have, such that all of their files can become accessible from anywhere in the world without uploading or intermediaries. This technology is included in Plaintiff's flagship application ecosystem called AXEL.

11.     AXEL allows users to maintain unprecedented custody and control over their files even while they share them with others. With AXEL, a user can share any file they own, on any device, with anyone with just a few clicks. Like TackApp, which is included in AXEL, files can be shared with others without uploading them to a server that the user does not control. As a result, no third-party possesses or control the user's files, even when the files are shared with other users. This eliminates third party access to those files or the increased security risks that come with third-party possession or control of data.

12.     AXEL has achieved commercial success. By 2018, the AXEL app had millions of users and a 4.4 star rating on Google Play (one place where it can be downloaded). By that time, six patents had been awarded by the U.S. Patent and Trademark Office on technology and features such as such as file sharing, TackApp, secure authentication, and data security, which are included in AXEL. To date, nine patents concerning features included in AXEL have been issued or indicated by the U.S. Patent and Trademark Office to be allowable.

13.     Blockchain is a term that relates to computer technology whereby a list of records, called blocks, are linked together, forming a chain of blocks. Typically, new records can be added to the chain, but old records cannot be deleted from a chain. The chain is maintained by many unrelated participating computers. As multiple computers have records of the various blocks, existing blocks cannot be altered by any one participant. Similarly, additional blocks are added to the chain typically only after a consensus among the multiple computers is reached that the block should be added.

14.     In recent years, blockchain has been put to various uses, perhaps the most

COMPLAINT

prominent of which is the cryptocurrency, Bitcoin. A cryptocurrency is essentially a digital currency that is decentralized. This contrasts with a traditional currency that may be controlled by a central banking system.

15.     First released in 2009, Bitcoin uses a public distributed ledger, like that described above, such that each coin has a chain of information associated with it. When a coin holder attempts to use a Bitcoin the coin's entire history can be referenced to determine whether that the coin is valid and that the user trying to use it actually possesses it. While a currency is one use, blockchain has been used in many other areas.

16.     Since its early use by a small group of enthusiasts, recognition and utilization of blockchain technology grew over time. By 2016, blockchain technology had become much more popular. At that time, it also attracted entrepreneurs who often formed teams of individuals that focused on how blockchain technology could be used to improve processes or solve problems. These individuals, who were sometimes considered the "founders" of their solution or "project," often lacked funding to marshal the resources to develop and build the solution envisioned by the project founders. However, many soon began to utilize technology and concepts related to blockchain and cryptocurrency to obtain funds that could be put towards doing so.

17.     For example, some blockchain projects orchestrated a sale of crypto coins or "tokens" to raise funds. Essentially, the project would accept funds in exchange for tokens that are specific to a project, or even in exchange for a promise that the purchaser would be provided tokens at some point in the future once the tokens were created. In some instances, the tokens would be intended for use within the ecosystem of the project. For example, tokens for a particular project may ultimately be intended to allow a holder to exchange them for a good or service that is associated with the solution that the founders envisioned. A purchaser might purchase tokens (or a promise to be issued tokens) either to use themselves once the solution became operational, or perhaps to trade the tokens or promise of future tokens for tokens of other projects or even traditional currency.

18.     Typically, the founders would initiate this token sale process by publishing a "white paper" that explained their idea, what problem they sought to solve, what their solution was, who they were, why they felt they would be successful, and how they planned to spend the funds received to build the solution. This white paper would be one part of a promotional effort through multiple different channels to increase awareness of the project and to help grow enthusiasm for it.

19.     As general awareness and enthusiasm for blockchain technology and sales and exchanges of crypto tokens increased, many projects were able to raise millions of dollars by conducting a token sale. The increase in demand to purchase tokens (or promises for tokens in the future) led to a "seller's market" where more and more projects had success conducting token sales. By the end of 2017, hundreds if not thousands of token sales had been conducted.

20.     Indeed, by mid-2017, token sales had become so prominent that the Securities and Exchange Commission in the United States ("SEC") issued a press release concerning token sales and an "investor bulletin" that same day on "Initial Coin Offerings." *See https://www.investor.gov/additional-resources/news-alerts/alerts-bulletins/investor-bulletin-initial-coin-offerings.* In the bulletin, the SEC noted that token sales had been "increasingly" used to "raise capital." The SEC also noted that due to the demand in this area, legitimate as well as illegitimate entities had entered the space. It warned potential token purchasers to beware of fraudulent schemes.

21.     As an example of the momentum of blockchain technology, the value of one bitcoin, as established by websites that exchange bitcoins for U.S. dollars, on January 1, 2016 was approximately $430. On January 1, 2017, one bitcoin had a value of approximately $1000, an increase of 250% from the previous year. On July 1, 2017, one bitcoin had a value of approximately $2400, indicating an increase of 240% from six months prior. On October 1, 2017, one bitcoin had a value of approximately $4400; on November 1, 2017, one bitcoin had a value of approximately $6700; on December 1, 2017 one bitcoin had a value of more

than $10,000. While the value subsequently decreased during 2018, by July 1, 2018, the value of one bitcoin was still more than $6300, representing more than a 250% increase from one year earlier, but at the same time, decreasing from months prior. Many other crypto tokens experienced similar growth profiles during this time.

22.     The momentum of blockchain technology, in addition to attracting more and more projects into the space with the hopes of selling crypto tokens, also attracted entities into the space to provide services to entities that were considering conducting token sales. One such entity was Vanbex.

23.     Upon information and belief, Cheng was a founder of Vanbex in 2013 and has, at all times since, been an officer of Vanbex. Upon information and belief, Hobbs has been the CEO of Vanbex since 2015.

24.     According to a Vanbex press release, it was "established in 2013 to better tell the story of digital currency and blockchain-based companies, [and, as of May 30, 2017] Vanbex has since evolved into a blockchain-based products and advisory services firm." In another exemplary press release in September 2016, Vanbex stated that it was "a blockchain-based products and services firm, specializing in all aspects of the industry."

25.     Upon information and belief, by the middle of 2017, Vanbex had been promoting for at least one year that it had worked with "over 30 companies" in the blockchain space. Among the services that Vanbex claimed to offer at that time was "Investment Marketing & Relations," about which it elaborated: "From raising capital to establishing banking partners, we've helped clients worldwide set up new operations and define new processes."

26.     By December 2017, Vanbex claimed to have "an extensive track record of incubating successful blockchain companies with over 60 blockchain companies in their portfolio some of which are the top companies in the industry globally, and have been able to help their clients raise over $100 Million in ICO's for their clients this partnership will help bring blockchain technology to the masses." [*sic*] This statement was attributed to

Vanbex CEO Kevin Hobbs in a December 5, 2017 Vanbex press release.

27.    As part of Vanbex's purported track record, it touted that it had conducted its own token sale. That token sale was conducted by Vanbex through an entity named Etherparty.

28.    Upon information and belief, Vanbex is under the sole control of Hobbs and Cheng. Upon information and belief, Vanbex, Hobbs, and Cheng also control Etherparty, which, upon information and belief, was created by Cheng in 2015. Upon information and belief, from its inception, Hobbs and Cheng have held the same titles at Etherparty as they do at Vanbex, namely, Cheng is the Founder and "Head of R&D" and Hobbs is CEO.

29.    In September 2017, a press release stated that Etherparty had sold out its presale and had received over $25 million in doing so. The press release included quotes from Hobbs and Cheng. Hobbs was stated to be "CEO" of Etherparty, and the press release listed his contact email as k@vanbex.com. Etherparty was stated to be "founded in 2015 by Lisa Cheng, of the Vanbex Group."  Etherparty later touted that it raised more than $30 million by the end of October 2017.

30.    For Plaintiff, the prospect of incorporating blockchain technology into AXEL opened up a range of possibilities. As one example, blockchain technology could be used with AXEL to facilitate transactions between users of digital files. Instead of just enabling users to share files with other users, blockchain technology could enable a user to get something in return for the exchange, and to allow the exchange to take place without involving a controlling third party. This offered a chance to make significant enhancements to AXEL that could be utilized by its users. For example, digital files like music or photographs could be sold directly by their authors without having to use the typical third-party services, which take large shares of the revenue and have their own set of rules if their marketplace is used.

31.    Moreover, Plaintiff compared favorably in many respects to other blockchain projects that had success selling tokens in 2017, including even Etherparty itself. By the end

of 2017, Plaintiff had already released products with millions of users, been awarded patents on its technology, and possessed a relatively large team including dozens of hard to acquire developers. This differentiated Plaintiff from the many projects that largely consisted only of one or more persons and an idea set forth in a white paper. It also distinguished Plaintiff from illegitimate projects that were primarily interested in raising funds and might not even intend to actually build their proposed solution. Further setting Plaintiff apart, it was quite unusual for any blockchain project to be associated with a company that had already successfully built and released technology and had a significant user base. This remains unusual among blockchain projects even today.

32.     In the fall of 2017, Plaintiff began working on integrating blockchain technology to AXEL. As part of this effort, Plaintiff determined that existing blockchains did not allow it to optimally integrate its corporate mission of data control with what would be needed to maximize efficiency in peer to peer transactions. As a result, Plaintiff conducted research and conceived of its own blockchain, which it named the AXEL Blockchain. Multiple patent applications were eventually filed on the AXEL Blockchain, including U.S. Patent Application Nos. 15/961,521 and 16/035,658.

33.     Around the same time, Plaintiff began to explore the possibility of conducting a crowd sale of tokens that would work with the AXEL app and on the AXEL Blockchain, which Plaintiff named AXEL Tokens. Among other things, Plaintiff drafted a white paper and began to gauge interest in a token sale, should it decide to conduct one.

34.     As part of its exploration, Plaintiff became aware of Vanbex and its purported expertise in conducting token sales. Plaintiff was particularly interested in Vanbex due to Vanbex's claimed success in not only raising over $30 million in its own token sale, but due to Vanbex's claimed success raising funds for other entities. For example, upon information and belief, at that time, Vanbex's website touted that the services it offered included "Investment Marketing & Relations" which it described as "From raising capital to establishing banking partners." Vanbex also promoted itself as working "hands on from your

technical plan and business goals to develop the strategy and content for the successful launch of your coin/token."

35.     After seeing Vanbex's promotional materials, Plaintiff first contacted Vanbex on or about January 5, 2018, and an initial telephone call occurred between Plaintiff and Vanbex on or about January 8, 2018. Cheng and Matt Lockyer participated on behalf of Vanbex. On that call, Plaintiff informed Vanbex that it was looking for assistance with a potential token sale. From this first call, it was made clear by Plaintiff to Vanbex that the only reason that Plaintiff was considering engaging Vanbex was due to its purported ability to not only introduce Plaintiff to potential token purchasers, but to utilize its own efforts to directly sell tokens to potential purchasers.

36.     On the call, Cheng and Lockyer touted Vanbex's own token sale for Etherparty as well as its success with selling tokens for other clients. Cheng represented to Plaintiff that, if engaged, Vanbex would do the same for Plaintiff. Cheng also told Plaintiff that Vanbex charges a monthly fee of between $18,000 and $22,000 for its work and that it was selective in its client base and would have to vet Plaintiff's project prior to agreeing to an engagement.

37.     After the call, Plaintiff sent the then-current draft version of the white paper that it had been preparing to Cheng and Lockyer to allow Vanbex to better understand the project and to provide it with a view of what the present status of the project was so that it could determine what would be needed to complete the project.

38.     On January 26, 2018, Vanbex sent a contract proposal to Plaintiff. Despite the price quoted on the earlier call, this contract requested $120,000, or $40,000 per month over three months. It also proposed that Vanbex would receive a percentage of the proceeds from a sale of tokens, regardless of whether Vanbex made any efforts towards a particular token purchaser.

39.     On or about that same day, Richard Flagor, Vanbex's EVP – Sales and Marketing, became the Vanbex employee who was responsible for the procurement of Plaintiff as a Vanbex client and to then manage and service the Vanbex-Plaintiff contractual

1    relationship.

2          40.    The negotiation process continued for more than two subsequent months.

3    Throughout, Plaintiff continually made clear to Vanbex that Plaintiff was only considering

4    Vanbex due to its purported ability to not only introduce Plaintiff to potential token

5    purchasers, but to utilize its own efforts to directly sell tokens to potential purchasers.

6    Vanbex convinced Plaintiff to ultimately engage Vanbex by emphasizing that its efforts

7    towards selling tokens would be robust, and repeatedly referenced its expertise gained in

8    conducting its own sale as well as its efforts in token sales by its other clients.

9          41.    On or about March 6, 2018, another call was held between Plaintiff and

10   Vanbex, with Flagor and others participating on behalf of Vanbex. During this call Flagor

11   represented that, if engaged, Vanbex would sell AXEL Tokens to its purportedly extensive

12   list of contacts. This conversation was in part recounted in an email exchange afterwards.

13   For example, on March 6, 2018, Flagor sent an email message to Plaintiff stating that he

14   expected that Vanbex would be able to raise funds in a token sale from its own pool of

15   investors. Specifically, he stated "If I look at how we raised from Etherparty, (33M raise), my

16   expectation is that from that pool of investors we will be able to get a very similar number

17   (we have a book of about 8,000 investors). Also, I expect that your project will garner a fair

18   amount of interest both from VC and private crypto investors. I am not 100% of a number

19   as a guarantee, but I honestly think that we'll have very little issue hitting your 50M hard cap.

20   [*sic*]"

21         42.    Later that same day, Flagor and Plaintiff exchanged emails concerning

22   Vanbex's work for its other clients. Plaintiff specifically asked for examples from Vanbex's

23   other clients concerning raises. Flagor responded to Plaintiff that Vanbex had "3

24   testimonials on our website from Factom, Storj.jo, and Clef." Plaintiff responded by

25   inquiring whether Vanbex was "fully involved with Storj" and asking "Essentially were you

26   guys the ones who brought in all the money? I know Etherparty was all you guys." Flagor

27   responded, "Yup, we did their entire raise for their first offering . . . we built their tech, and

28

raised their funding to support their tech development. We also were instrumental in Enjin coin as well, and took them all the way to their raise amount of roughly 30M."

43.     On or about March 19, 2018, another call took place between Vanbex and Plaintiff. During this call, Plaintiff suggested that, since Vanbex was confident that it would be able to raise significant funds, that Vanbex only be awarded a percentage of the funds that it directly raised, and that it not be entitled to a commission based on funds raised by Plaintiff.

44.     As a result of these ongoing conversations and Vanbex's representations, Flagor stated on March 20, 2018 that Vanbex would want "5% on anything that comes in through the Vanbex channels." Thereafter, on or about March 22, 2018, Flagor sent a revised proposed contract to Plaintiff that incorporated a clause by which Plaintiff would pay Vanbex a commission based on the amount that Vanbex directly raises for the Plaintiff's token sale.

45.     On April 4, 2018, Plaintiff and Vanbex executed a Services Agreement. The Services Agreement specifies an effective date of April 9, 2018. The signature of Hobbs was electronically affixed to the document on behalf of Vanbex. Upon information and belief, Hobbs authorized or directed his signature to be affixed to the Services Agreement.

46.     Among other things, the Services Agreement memorializes Vanbex's promise to seek to directly raise funds. In particular, Paragraph 3(d) sets forth that "In addition to the Monthly Fees, the Company will pay the Consultant a commission based on the amount that Consultant directly raises in private placement for the Company in the ICO, as follows:".

47.     The Services Agreement also includes a Schedule A, which sets forth "services and related deliverables" that Vanbex was to provide to Plaintiff pursuant to the agreement.

48.     Schedule A provides that "The scope of services is broadly: whitepaper advising; token model advising; legal, regulatory and compliance advising; investor and exchange introductions; public relations support, events and sponsorship coordination; marketing messaging; community building and social media endeavors."

49.     Schedule A also set forth a timeline of deliverables of two months from the April 9, 2018 effective date of the Services Agreement.

50.     In accordance with the Services Agreement, Plaintiff was to pay Vanbex "base fees totaling US$80,000 for two months of Services starting from the Effective Date with an optional US$40,000.00 per month extension at the Company's discretion at the same service level." (parentheticals omitted).

51.     In reliance on Defendants' representations, Plaintiff entered into and proceeded pursuant to the Services Agreement in good faith.

52.     Plaintiff timely paid $80,000 to Vanbex pursuant to the Services Agreement upon receipt of associated invoices from Vanbex.

53.     Plaintiff was willing to perform its obligations under Paragraph 3(d) and pay Vanbex any commission it was to be owed.

54.     Vanbex did not perform its obligations under the Services Agreement.

55.     Vanbex did not introduce Plaintiff to a single investor or exchange.

56.     Vanbex did not make a good faith effort to directly raise funds for Plaintiff through Plaintiff's token sale.

57.     Upon information and belief, in order to fulfill its obligation to directly raise funds for Plaintiff, Vanbex would have needed appropriate regulatory licenses from Canadian and U.S. regulatory agencies. For example, upon information and belief, an entity cannot directly raise funds for another entity and/or accept a commission for raising funds for another entity from U.S. or Canadian persons without being a licensed broker/dealer. Upon information and belief, Vanbex, Cheng, and Hobbs knew or should have known that such a license was needed to fulfill its obligations under the Services Agreement. Vanbex, Cheng, and Hobbs knew that Vanbex did not possess such a license. Vanbex, Cheng, and Hobbs concealed from Plaintiff the fact that Vanbex did not have the necessary license to sell AXEL Tokens and receive a commission in return, and as such it was legally barred from being able to fulfill its primary contractual obligation.

58.     Vanbex failed to perform numerous other of its obligations, particularly in view of its claimed expertise in the area. For example, Vanbex provided either no output at all or else no useful work product as to at least the following items that it was obligated to provide pursuant to Schedule A of the Services Agreement: "Advise on the Company offering and position in industry;" "Assist with explaining token utility and blockchain solution;" "Positioning token for utility and exchange compliance;" "Discuss technical stack, architecture, roadmap and feasibility;" "Advise on the Company incorporation structure and domicile for public TGE;" "Check messaging to ensure utility of token is clear;" "Introduce legal counsel that may assist in framing," "Assist in achieving the widest possible investor base," "Provide consulting on SAFT terms and price," "Story mining," and "Assist in publishing of blog posts and newsletters through website."

59.     In many instances, Vanbex's failure to perform had a cascading effect that hindered, delayed, or damaged the project. For example, Vanbex's failure to promptly "introduce legal counsel" resulted in Plaintiff having to spend weeks researching, contacting, interviewing, and ultimately procuring legal counsel that it found on its own. Indeed, Vanbex knew or should have known, based on its claimed expertise, that very few attorneys in the U.S. were practicing in this space, and those that were qualified and reputable were in high demand, making it difficult to often even arrange for initial introductory conversations with appropriate counsel.

60.     However, Vanbex failed to provide introductions to any potential U.S. legal counsel despite Plaintiff's repeated requests to multiple individuals at Vanbex, including Hobbs, Flagor, and Vanbex's General Counsel. While Plaintiff ultimately secured U.S. legal counsel on its own, that legal counsel then had to work diligently to not only quickly get up to speed on the project, but to perform other tasks that Vanbex was already contracted to perform, including assisting with explaining the token utility and blockchain solution, positioning for compliance, providing advice on token messaging, incorporation structure, and domicile, and revising and finalizing the white paper.

61.     Given this, it was hardly surprising that Plaintiff did not complete a draft proposed agreement for the sale of future tokens (referred to in the Service Agreement as SAFT) until mid-June, which was a mere seven weeks from the time that it engaged counsel. Thus, while Vanbex has, since this dispute has arisen, tried to blame its own failures on Plaintiff, the underlying problem was that Vanbex did not do what it was contracted to do. The issue of legal counsel is but one of many examples that confirm this. Vanbex's failure on this front was also magnified due to the advice that it had previously given to Plaintiff to include U.S. purchasers in the token sale. Vanbex represented that it had a ready pool of U.S. investors and that Plaintiff had to include U.S. token purchasers in the sale in order to benefit from that pool. Upon information and belief, Cheng and Hobbs authorized and were both aware that Vanbex routinely made representations to potential clients concerning Vanbex's potential U.S. investor pool as Cheng and Hobbs knew that a portion of Etherparty's claimed success had been achieved through U.S. token purchasers. Cheng herself made such representations to Plaintiff on at least January 8, 2018. Upon information and belief, Hobbs knew or should have known that Vanbex made such representations to Plaintiff. Upon information and belief, Cheng and Hobbs knew or should have known that Plaintiff relied on such representations in executing the Services Agreement. Plaintiff's original plan had been to not include U.S. token purchasers due to the complexity and uncertainty of associated U.S. regulations. However, due to Vanbex's representation about its pool of U.S. token purchasers, Plaintiff agreed to allow sales to U.S. purchasers. This necessarily multiplied the complexity of the legal analysis and setup that needed to be performed in order to comply with U.S. laws and regulations than would have been the case had Plaintiff only included non-U.S. purchasers in a potential token sale as Plaintiff originally planned to do.

62.     As another example, Vanbex failed to inform Plaintiff that it terminated its relationship with Flagor, who Vanbex had assigned to be the primary contact person at Vanbex for Plaintiff's engagement. Plaintiff discovered that Flagor was no longer with

Vanbex when it received an automatic bounceback message after sending an email to Flagor's Vanbex email account. Vanbex never offered an explanation as to why it terminated its relationship with Flagor.

63.     Nonetheless, throughout the relationship Flagor repeatedly represented that he had or would soon contact Vanbex's investor pool and that he had received positive feedback concerning Plaintiff's token sale. However, whenever Plaintiff followed up to find out who Vanbex had spoken to, Vanbex declined to provide any of its claimed pool of contacts to Plaintiff or to introduce Plaintiff to any of them.

64.     As one example of Vanbex's broken promises in this regard, on April 12, 2018, Vanbex emailed Plaintiff concerning its purported organization efforts for an upcoming blockchain conference in New York City called Consensus. Its proposal stated, "We've secured the following for StoAmigo (all complimentary):" "2 x Coin Center Dinner tickets," "Access to Vanbex's private meeting space at the conference," and "Introductions to relevant investors from the Vanbex rolodex." Plaintiff traveled to the conference only to find out that Vanbex had not done any of these things. Vanbex had not procured Plaintiff tickets for any dinners, Vanbex had no private meeting space, and Vanbex did not introduce Plaintiff to any "relevant investors from the Vanbex rolodex." Instead, it was clear that Vanbex's sole purpose at the conference was to promote itself to other potential future clients.

65.     Despite the failure of Vanbex to perform within the allotted timeframe, Plaintiff was willing to provide Vanbex with a chance to rectify its performance failures. Plaintiff asked Vanbex to schedule a teleconference to discuss whether Vanbex was willing to rectify its non-performance. After having multiple calls scheduled, Plaintiff making its top executives available, and then having the calls cancelled or rescheduled at the last minute by Vanbex, Plaintiff and Vanbex finally had a teleconference on July 12, 2018.

66.     Hobbs, Cheng, and others at Vanbex were present for the July 12, 2018 teleconference. During that call, Hobbs made clear that Vanbex never intended to fulfill its

obligations under the Services Agreement, leading to the obvious conclusion that Vanbex, Cheng, and Hobbs had fraudulently induced Plaintiff into the agreement so that Plaintiff would pay fees to Vanbex even while Vanbex, Cheng, and Hobbs did not, and knew all along that Vanbex would not, deliver the promised services.

67.     In particular, Hobbs revealed that, contrary to what his underlings had told Plaintiff, Vanbex had made no effort to present Plaintiff's project or token sale to anyone. When presented with the fact that Plaintiff had been told otherwise, Hobbs responded that they must not have been telling the truth because "I am the one at Vanbex with the contacts."

68.     Hobbs also claimed that Vanbex was not obligated to directly raise funds and be compensated for the same, and as a result, Vanbex could never have had any intention of undertaking this.

69.     Therefore, it was clear that Hobbs was the only one at Vanbex capable of fulfilling Vanbex's contractual obligations to introduce Plaintiff to potential purchasers and to directly sell AXEL Tokens, and that he not only never did so, but was not willing to do so. Furthermore, from the first initial call between Plaintiff and Vanbex to the day that Flagor was terminated, Hobbs was never a direct participant of any discussions between Vanbex and Plaintiff. Indeed, to the best of Plaintiff's knowledge, his only direct correspondence with Plaintiff was when Plaintiff unsuccessfully sought to obtain contacts and introductions to U.S. counsel.

70.     Thus, according to Hobbs himself, he was the only person at Vanbex capable of fulfilling Vanbex's contractual obligations to Plaintiff, and he made no effort to do so and never intended to do so.

71.     During the July 12, 2018 teleconference, Hobbs also responded to Plaintiff's recounting of its requests for introductions to U.S. legal counsel and the subsequent problems that Vanbex's failure to fulfill this obligation had caused Plaintiff by stating that he "knows eight different law firms" that Plaintiff could have used.

72.     Despite the obvious issues with Vanbex's non-performance, including its own CEO explaining that Vanbex never intended to honor the contract, Vanbex, Cheng, and Hobbs declined to offer Plaintiff a refund of the funds it had already paid to Vanbex. Instead, Vanbex shockingly demanded further funds from Plaintiff just to continue to undertake any work at all on Plaintiff's behalf.

73.     The sum total for Plaintiff of having ever interacted with Vanbex was that it wasted valuable time and resources with Vanbex, and Vanbex never fulfilled, and never had the intention of fulfilling, its obligations. Plaintiff not only paid Vanbex on time, but it made a good faith effort to help ensure the relationship was a success. Plaintiff expended other funds towards its token sale in reliance on its contract with Vanbex. Among other things, Plaintiff paid fees to U.S. legal counsel, and spent time and money on promotional activities to support the efforts that Vanbex was obligated to make.

74.     Moreover, Plaintiff's token sale was set back for months due to its engagement of Vanbex and Vanbex's advice to Plaintiff to open its token sale to U.S. purchasers due to Vanbex's extensive prospects in the U.S., while at the same time failing to provide any assistance with procuring U.S. legal counsel who would be necessary to effectuate that decision while navigating a complex and fluctuating regulatory environment. Unfortunately, during that time, the market potential for token sales contracted dramatically, as illustrated by the price of other crypto coins during this timeframe. For example, the price of one bitcoin in early May 2018, which was one month after Plaintiff and Vanbex executed the Services Agreement, reached nearly $10,000. However, by the time of the July 12, 2018 teleconference whereby Plaintiff tried to salvage its relationship with Vanbex, the price had dropped to under $6,300, and the price has not gone above $8,000 since July 29, 2018. As a result, engaging Vanbex caused Plaintiff to miss the timeframe in which it otherwise would have been able to conduct a successful sale of AXEL Tokens.

///

///

# FIRST CLAIM FOR RELIEF

## Fraud in the Inducement
## (Against Vanbex, Cheng, and Hobbs)

75.     Plaintiff realleges and incorporates each and every foregoing paragraph of this Complaint  as if fully set forth herein.

76.     Multiple Vanbex employees and agents, including Flagor, Cheng, and Hobbs represented that Vanbex would utilize its own efforts to directly sell AXEL Tokens to potential purchasers. The same individuals also expressed or implied that Vanbex was legally capable of doing so.

77.     Cheng participated on multiple teleconferences with Plaintiff in which she and other Vanbex employees solicited Plaintiff to enter the Services Agreement. During those conversations Cheng, Flagor, and other Vanbex employees or agents falsely told Plaintiffs that Vanbex could and would sell AXEL Tokens to third parties.

78.     Hobbs' signature appears on the Services Agreement on behalf of Vanbex. Upon information and belief, Hobbs' authorized his signature on the Services Agreement, and in so doing expressly represented that Vanbex could and would sell AXEL Tokens to third parties.

79.     Cheng and Hobbs knew that Vanbex routinely used Vanbex's token sale through Etherparty as a selling point to obtain clients for Vanbex. Cheng and Hobbs knew or should have known that Vanbex used its success with Etherparty and promise to sell to the same pool of individuals to induce Plaintiff to enter into the Services Agreement. Indeed, Cheng and Hobbs had knowledge of and/or ratified the Services Agreement between Vanbex and Plaintiff that included Vanbex's commission for directly raising funds for Plaintiff.

80.      All of Vanbex, Cheng and Hobbs' representations were false and Vanbex, Cheng and Hobbs knew their representations to be false at the time they were made. Indeed, Hobbs, Vanbex's CEO, admitted after Vanbex had been paid $80,000 by Plaintiff that Vanbex never had any intention of undertaking its own efforts to directly sell AXEL Tokens

COMPLAINT

to third parties.

81.    Cheng and Hobbs ratified their and Vanbex's false representations when Vanbex accepted funds from Plaintiff, for work Vanbex knew it was legally barred from performing, and then refused to return them.

82.    Upon information and belief, Vanbex, Cheng and Hobbs knew that without the appropriate regulatory licenses, Vanbex could not legally directly sell AXEL Tokens to potential purchasers in exchange for a commission. Vanbex, Cheng, and Hobbs concealed from Plaintiff this material information, which if Plaintiff knew it Plaintiff would not have entered the Services Agreement or paid Vanbex $80,000 to sell AXEL Tokens when it was legally barred from doing so.

83.    Vanbex, Cheng and Hobbs intended to deceive Plaintiff or that Plaintiff would rely on their false representations.

84.    Plaintiff believed and reasonably relied on Vanbex's false representations. Had it not been for Vanbex's false representations, Plaintiff would not have executed the Services Agreement or paid Vanbex, let alone the sum of $80,000. Had it not been for Vanbex's false representations, Plaintiff would have engaged an alternative entity that would have served the primary functions for which it engaged Vanbex, or otherwise procured the resources necessary to do so in another manner.

85.    As a direct and proximate result of Vanbex's false representations, Plaintiff has been damaged in the amount of no less than $80,000 that it paid to Vanbex. Additional financial injuries include funds and resources Plaintiff spent to support Vanbex, including funds paid to Plaintiff's U.S. legal counsel and funds spent on promotional activities. Plaintiff has also been damaged as it lost profits it would have earned if it could have timely sold AXEL Tokens when the marketplace for Plaintiff's contemplated token sale was still friendly.

86.    In doing the things herein alleged, Vanbex, Cheng, and Hobbs acted with malice, oppression and/or fraud pursuant to California Code of Civil Procedure Section

3294(c), and acted willfully and with the intent to cause injury to Plaintiff. As such, Vanbex, Cheng, and Hobbs are therefore guilty and liable for malice, oppression and/or fraud and Plaintiff is entitled to recover an award of exemplary and/or punitive damages.

## SECOND CLAIM FOR RELIEF

### Negligent Misrepresentation
### (against Vanbex, Cheng, and Hobbs)

87.    Plaintiff realleges and incorporates each and every foregoing paragraph of this Complaint as if fully set forth herein.

88.    Multiple Vanbex employees or agents, including Flagor, Cheng and Hobbs represented that Vanbex would utilize its own efforts to directly sell AXEL Tokens to potential purchasers. The same individuals also expressed or implied that Vanbex was legally capable of doing so, such as by signing or ratifying the Services Agreement.

89.    Those representations, by Vanbex, Cheng, and Hobbs, were false.

90.    Even if Vanbex, Cheng, and Hobbs may have honestly believed that the representations were true, Vanbex, Cheng, and Hobbs had no reasonable basis for believing that representations to Plaintiff that Vanbex could and would directly utilize its own efforts to directly sell AXEL Tokens to potential purchasers. Vanbex, Cheng, and Hobbs had no reasonable basis for believing that Vanbex was legally capable of selling AXEL Tokens to third parties.

91.    This is clear at least because Cheng and Hobbs knew that Vanbex routinely used Vanbex's token sale through Etherparty as a selling point to obtain clients for Vanbex. Cheng and Hobbs knew or should have known that Vanbex used its success with Etherparty and promise to sell to the same pool of individuals to induce Plaintiff to enter into the Services Agreement. Indeed, Cheng and Hobbs had knowledge of and/or ratified the Services Agreement between Vanbex and Plaintiff that included Vanbex's commission for directly raising funds for Plaintiff.

92.    Vanbex, Cheng, and Hobbs intended that Plaintiff rely on their representations.

93.     Separately, Vanbex, Cheng, and Hobbs concealed from Plaintiff this material information, which if Plaintiff knew it Plaintiff would not have entered the Services Agreement or paid Vanbex $80,000 to sell AXEL Tokens when Vanbex was legally barred from doing so.

94.     Cheng was aware of Vanbex's obligation to raise funds for Plaintiff at or about the time the Services Agreement was executed.

95.     Cheng and Hobbs ratified the false representation that Vanbex would sell AXEL Tokens to third parties, when Vanbex accepted funds from Plaintiff. Cheng and Hobbs again ratified those false representations when Vanbex refused to return Plaintiff's funds after being made aware of Vanbex's failure to perform its obligation to raise funds for Plaintiff pursuant to the Services Agreement.

96.     Plaintiff reasonably relied on Vanbex, Cheng and Hobbs's false representations. Plaintiff's reliance on the Vanbex, Cheng, and Hobbs false representations was a substantial factor in causing Plaintiff's injury. Had it not been for the false representations, Plaintiff would not have executed the Services Agreement or paid Vanbex the sum of $80,000. Had it not been for Vanbex's false representations, Plaintiff would have engaged an alternative entity that would have served the primary functions for which it engaged Vanbex, or otherwise procured the resources necessary to do so in another manner.

97.     As a direct and proximate result of Vanbex, Cheng and Hobbs's false representations, Plaintiff has been damaged in the amount of no less than $80,000 that it paid to Vanbex. Additional financial injuries include funds and time that Plaintiff expended to support Vanbex, including funds paid to Plaintiff's U.S. legal counsel and funds spent on promotional activities. Separately, Plaintiff has also been damaged as it lost profits it would have earned if it could have timely sold AXEL Tokens when the marketplace for Plaintiff's contemplated token sale was still friendly.

///

///

### THIRD CLAIM FOR RELIEF

**Breach of Contract**
**(against Vanbex)**

98.     Plaintiff realleges and incorporates each and every foregoing paragraph of this Complaint as if fully set forth herein.

99.     Plaintiff and Vanbex entered into a contract whereby Vanbex was required to perform obligations set forth in the Services Agreement, including to undertake efforts to directly sell tokens, to introduce Plaintiff to potential token purchasers, the other services set forth in Schedule A, and other obligations expressly or impliedly set forth by the Services Agreement. Vanbex was obligated to perform the services set forth in Schedule A within two months of April 9, 2018, the effective date of the Services Agreement.

100.     Plaintiff made clear to Vanbex that a lack of efforts by Vanbex to directly sell tokens and to introduce Plaintiff to potential token purchasers would constitute a material breach of the Services Agreement as Plaintiff would not have entered into the Services Agreement without such promises from Vanbex.

101.     Vanbex breached the contract by failing to perform the aforementioned obligations. Vanbex did not undertake efforts to directly sell AXEL Tokens. Vanbex did not introduce Plaintiff to any potential token purchasers, and Vanbex did not perform many other obligations set forth in Schedule A, including but not limited to its obligations to: "Advise on the Company offering and position in industry;" "Assist with explaining token utility and blockchain solution;" "Positioning token for utility and exchange compliance;" "Discuss technical stack, architecture, roadmap and feasibility;" "Advise on the Company incorporation structure and domicile for public TGE;" "Check messaging to ensure utility of token is clear;" "Introduce legal counsel that may assist in framing;" "Assist in achieving the widest possible investor base;" "Provide consulting on SAFT terms and price;" "Story mining;" and "Assist in publishing of blog posts and newsletters through website." Each of the foregoing represents a separate material breach of the Services Agreement. Vanbex breached the Services Agreement when it failed to perform the aforementioned obligations

COMPLAINT

by June 8, 2018, at the latest.

102.   Plaintiff fully performed its material obligations under the Services Agreement including paying Vanbex its $80,000 fee.

103.   Plaintiff was damaged in an amount to be proven at trial, but no less than the $80,000 it paid to Vanbex. Additional injuries will be proven at trial, but include other expenses that Plaintiff incurred due to Vanbex's breach, including payments to U.S. legal counsel and promotional expenses, and the lost profits by engaging Vanbex and the delay in Plaintiff's token sale caused by Vanbex's failure to perform.

## FOURTH CLAIM FOR RELIEF

### Breach of the Covenant of Good Faith and Fair Dealing
### (Against Vanbex)

104.   Plaintiff realleges and incorporates each and every foregoing paragraph of this Complaint as if fully set forth herein.

105.   Plaintiff and Vanbex entered into a contract whereby Plaintiff agreed to pay Vanbex an $80,000 fee plus a commission on all amounts that were received from Vanbex's direct sale of AXEL Tokens to potential purchasers.

106.   Vanbex knew or had reason to know that Plaintiff was relying on it to undertake efforts to sell AXEL Tokens. Indeed, Vanbex knew that this was the main reason Plaintiff agreed to enter the Services Agreement.

107.   Vanbex breached the covenant of good faith and fair dealing by entering into the Services Agreement with Plaintiff, which agreement included a commission for Vanbex for the results of its efforts and purported pool of potential token purchasers, and then not expending efforts to sell AXEL Tokens.

108.   Separately, Vanbex breached its duty of good faith and fair dealing by concealing from Plaintiff the material fact that Vanbex could not legally directly sell AXEL Tokens to third parties in exchange for a commission, and was therefore legally barred from doing so. Vanbex owed a duty to disclose this material fact to Plaintiff and Vanbex's

1 concealment of this fact directly resulted in Plaintiff's injuries.

2      109.   Further, Vanbex breached its duty of good faith and fair dealing by failing to

3 make use a good faith effort to perform its obligations within the two month period set

4 forth by the Services Agreement.

5      110.   Vanbex's breach is particularly egregious as it accepted $80,000 in payments

6 from Plaintiff, executed the Services Agreement with the aforementioned knowledge, and

7 never intended to undertake efforts to sell AXEL Tokens. Vanbex then refused to return

8 Plaintiff's payments totaling $80,000.

9      111.   Plaintiff was damaged in an amount to be proven at trial, but no less than the

10 $80,000 it paid to Vanbex. Additional injuries will be proven at trial, but include other

11 expenses that Plaintiff incurred due to Vanbex, including payments to U.S. legal counsel and

12 promotional expenses, and lost profits it would have earned if it could have timely sold

13 AXEL Tokens when the marketplace for Plaintiff's contemplated token sale was still

14 friendly.

15

16                         **PRAYER FOR RELIEF**

17 WHEREFORE, Plaintiff prays for judgment as follows:

18     A.    For general, special damages and/or compensatory damages according to proof

19           at trial but that is no less than $80,000;

20     B.    For compensatory damages in an amount to be determined at trial that is no

21           less than the amount of Plaintiff's opportunity lost due to its engagement of

22           Vanbex as a result of Vanbex's inducement;

23     C.    For exemplary damages;

24     D.    For restitution, as permissible by law;

25     E.    For costs of suit incurred herein, including reasonable attorney's fees as

26           permitted by law;

27     F.    For pre-judgment interest at the maximum legal rate commencing no later than

28

June 9, 2018;

G.    For post-judgment interest at the maximum legal rate;

H.    For all other relief that the Court deems just and proper.

DATED: January 10, 2019                    HELLMICH LAW GROUP, PC


                                           By: s/ Christopher Hellmich
                                           CHRISTOPHER W. HELLMICH

                                           Attorney for Plaintiff StoAmigo International, LLC

26
COMPLAINT

## <u>**JURY DEMAND**</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff StoAmigo International, LLC respectfully demands a trial by jury on all issues so triable.

DATED: January 10, 2019                     HELLMICH LAW GROUP, PC


                                            By: s/ Christopher Hellmich
                                            CHRISTOPHER W. HELLMICH

                                            Attorney for Plaintiff StoAmigo International, LLC